1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   CHRISTOPHER LEON BAKER,                      CASE NO. 04-CV-1533 H
                                                  (BLM)
12                                   Plaintiff,
                                                  **ORDER ADOPTING**
13           vs.                                  **REPORTS AND**
                                                  **RECOMMENDATIONS AND**
14   JAMES A. YATES,[1] Warden,                   **DENYING PETITION**

15                                   Defendant.

16

17           Petitioner Christopher Leon Baker, a state prisoner proceeding pro se, brings this

18   petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Doc. No. 1.)

19   Respondent answered the petition on November 15, 2004. (Doc. No. 10.) On February

20   17, 2005, Petitioner filed a traverse and supporting memorandum. (Doc. Nos. 19, 20.)

21   On July 1, 2005, Petitioner filed a supplement to his traverse regarding DNA testing

22   results ("Suppl. Traverse").  (Doc. No. 25.)  Respondent filed a supplemental answer

23   on July 26, 2005.  (Doc. No. 27.)  The Magistrate Judge issued her first report and

24   recommendation ("R&R1") proposing denial of the petition on November 17, 2005.

25

26   _____

27           [1] The Court sua sponte substitutes James A. Yates, the current warden at Pleasant Valley State
     Prison, in place of Gail Lewis, the former warden.  Additionally, the Court DISMISSES former
28   California Attorney General, and current State Treasurer, Bill Lockyer from this case as an improper
     party because he is not a proper respondent.  See Rule 2(a), 28 U.S.C. foll. § 2254 (state officer having
     custody of petitioner is proper respondent).

(Doc. No. 28.) Petitioner filed his objections to R&R1 on January 10, 2006.[2] (Doc. No. 30.) Respondent did not file a reply to Petitioner's objections.  On April 21, 2006, the Court ordered Respondent to apprise the Court of the results of additional DNA testing. (Doc. No. 31.)  Respondent filed a copy of the report on supplemental DNA testing on June 20, 2006. (Doc. No. 35.) On July 20, 2006, the Court granted in part Petitioner's objections to R&R1 and granted his request to expand the record to include supplemental DNA testing. (Doc. No. 36.) Further, the Court referred the matter back to the Magistrate Judge to issue an additional report and recommendation in light of the expanded record.  (Id.)

After the Magistrate Judge ordered further briefing regarding the most recent DNA testing results, Petitioner filed a supplemental brief in support of his petition ("Suppl. Brief") on August 29, 2006.  (Doc. No. 39.)  On October 25, 2006, Respondent filed a second supplemental answer to the petition. (Doc. No. 44.)  The Magistrate Judge ordered a second round of additional briefing, and Respondent filed a supplemental memorandum of points and authorities on February 9, 2007. (Doc. No. 49.)  Petitioner filed a second supplemental brief on April 11, 2007 ("2nd Suppl. Brief").  (Doc. No. 53.)  The Magistrate Judge issued a supplemental Report and Recommendation ("R&R2") proposing denial of the petition on June 15, 2007. (Doc. No. 54.)  Petitioner has not filed any objections to R&R2.

For the reasons stated below, the Court **ADOPTS** the Reports and Recommendations and **DENIES** Petitioner's petition.  Further, the Court **DENIES** Petitioner's request for an evidentiary hearing.

### State Proceedings

On January 20, 2000, the government filed a twelve count information in San Diego Superior Court (Superior Court Case No. SCD 146719), charging Petitioner and

---

[2] The Court notes that Petitioner filed an application for enlargement of time to file objections to the R&R on December 12, 2005.  (Doc. No. 29.)  Because Petitioner's objections to the R&R were filed and accepted by the Court on January 10, 2006, Petitioner's application for additional time is moot.

04cv1533

co-defendant Deandre Maurice Lambert with conspiracy (California Penal Code ("PC") § 182(a)(1)) (count one), forcible rape (PC § 261(a)(2)) (count two), forcible rape while acting in concert (PC §§ 261(a)(2) and 264.1) (count three), sodomy by use of force (PC § 286(c)(2)) (count four), sodomy while acting in concert (PC § 286(d)) (count five), attempted rape by foreign object (PC §§ 289(a)(1) and 664) (count six), robbery (PC § 211) (counts seven and eight),[3] burglary (PC § 459) (count nine), receiving stolen property (PC § 496(a)) (count ten), possession of a firearm by a felon (PC § 12021(a)(1)) (count eleven), and resisting an officer (PC § 148(a)(1)) (count twelve).[4] (Lodgment 1, Clerk's Transcript, Vol. 1 ("CT1") at 12-24.)

On February 1, 2000, a jury convicted Petitioner of conspiracy to commit first degree robbery, rape, burglary, forcible rape, forcible rape while acting in concert, sodomy by use of force, sodomy while acting in concert, attempted rape by foreign object, attempted robbery of Elizabeth J., first degree robbery of Nikolas S., residential burglary, receiving stolen property, possession of firearm by felon, and resisting an officer. (Lodgment 2, Clerk's Transcript, Vol. 2 ("CT2") at 205-06.) The superior court sentenced Petitioner to a term of thirty-five years to life plus twenty-six years on September 28, 2000. (CT2 at 397-99.)

On May 31, 2001, Petitioner appealed his conviction to the California Court of Appeal. (Lodgment 11.) On the same day, Petitioner also filed a petition for writ of habeas corpus in the California Court of Appeal, along with a request that the Petition be consolidated with his pending appeal. (Lodgment 12.) The appellate court consolidated Petitioner's appeal with his habeas petition before denying the habeas petition and affirming the conviction on April 24, 2002. (Lodgment 15, People v. Baker, D036645.) On May 10, 2002, Petitioner appealed the appellate court's decision to the California Supreme Court. (Lodgment 16.) The court denied review on July 10,

---

[3] The information lists two counts of robbery within count seven: one committed against Elizabeth J. and the other against Nikolas S.

[4] Only Petitioner was charged with counts ten, eleven, and twelve.

1   2002.  (Lodgment 17, People v. Baker, S107022.)

2      Petitioner filed a second habeas petition in state superior court.[5]  (Lodgment 18.)

3   The petition was denied on July 11, 2003.  (Lodgment 19, In re Baker, HC 17426, SCD

4   146719.)  On August 11, 2003, Petitioner filed a habeas petition in state appellate

5   court.  (Lodgment 20.)  The state appellate court denied the petition on September 10,

6   2003, adopting the state superior court's order.  (Lodgment 21, In re Baker, D042686.)

7   Petitioner filed a habeas petition in the California Supreme Court on October 14, 2003.

8   (Lodgment 22.)  The California Supreme Court denied his petition on June 30, 2004,

9   stating in full: "Petition for writ of habeas corpus is DENIED."  (Lodgment 23, In re

10   Baker, S119680 (citing In re Clark 5 Cal.4th 750 (1993); In re Miller, 17 Cal.2d 734

11   (1941).)

12                          **Factual Background**

13      The following facts are taken from the California Court of Appeal opinion in

14   People v. Baker, D036645 (Cal. Ct. App. Apr. 24, 2002):

15          At approximately 12:30 a.m. on July 26, 1999, Elizabeth J., a
16   20-year-old college student, arrived at the apartment of her boyfriend
    Nikolas S. In the Mission Beach area of San Diego.  Elizabeth parked her
17   car in the driveway.  Nikolas was in the process of making dinner and was
    using a butcher knife to prepare the meal.

18          After about 20 to 30 minutes, Elizabeth returned to her car for a
    video movie and her overnight bag.  While at the car, she noticed a black
19   Lexus drive by.  The Lexus had dark tinted windows and shiny wheel rims.
    The car was going about 15 to 20 miles per hour in a northward direction.
20   Deandre Lambert was the driver.  Defendant and appellant Christopher
    Leon Baker was the passenger.  Both men looked at Elizabeth in a way that
21   she felt was odd.  She returned to the apartment and entered through the
    kitchen door.

22          Fifteen to twenty minutes later, appellant and Lambert entered the
23   apartment through the kitchen door.  Appellant kept his hand under his
    shirt. He said he had a gun under the shirt and stated: "I have a gun.  Don't
24   make me shoot you."  Elizabeth believed him.  Nikolas believed it was a
    gun.   Appellant followed Elizabeth, Nikolas and Lambert into the
25   livingroom.  He was holding the large knife Nikolas had used to prepare
    dinner.  He waved the knife in the air and threatened Elizabeth and Nikolas
26   with it.

27

28      [5] When Petitioner filed this habeas petition is unclear because the lodged copy does not contain
    a legible file stamp.  (Lodgment 18.)

Appellant told Elizabeth and Nikolas to "get down." One of the men yelled: "Who else is here? Who else is home?" Appellant then picked Elizabeth up by the pants and asked: "Where's the money? Where's the money?"

Lambert approached Nikolas and threatened to shoot him. He hit him on the side of the head with his fist. Lambert and appellant made the couple lie on the living room floor for about two minutes during which time they threatened to shoot and cut them. They then took the couple into Nikolas's bedroom where Elizabeth was made to bend over on the bed and Nikolas was forced to kneel down.

As they continued to ransack the bedroom, appellant and Lambert demanded money, guns, and drugs. Lambert struck Nikolas on the side of the head three or four times. Nikolas told appellant and Lambert about a box in the closet which contained about $100 in bills and Italian lire from a trip to Italy. He saw appellant take this money and then go through his wallet. He later discovered $20 had been taken from the wallet.

Elizabeth told appellant and Lambert she had no money but did have marijuana in her overnight bag in the kitchen. Appellant shoved and wrestled her into the kitchen but when she produced a small amount of the drug, he became upset and said: "Oh, you want to play games? Well, you know, let's play games." He demanded she remove all of her clothing, which she did.

Appellant took Elizabeth into Nikolas's roommate's room and made her lie down on the bed as he and Lambert searched the room. Lambert had previously made Nikolas put his head under his bed so he could not see what was happening.

When Lambert left the room, appellant demanded Elizabeth spread her legs. He attempted to insert a plastic bottle of foot spray in her vagina. He stopped because the bottle was too large. He left the room and returned a minute later, again demanding she spread her legs. He put his penis in her vagina, hurting her "very bad." This lasted a minute or two. She told him she needed to go to the bathroom. He stated: "Well, go pee. Go pee or else I'll cut you."

Lambert came into the room and told appellant there was no money and they should leave. Lambert's voice was getting louder. Appellant tried to put his penis in Elizabeth's anus and partially succeeded. She screamed and appellant and Lambert left.

Elizabeth curled up in a ball on the bed until she and Nikolas were sure appellant and Lambert were gone. She then went into the bathroom and noticed there was blood on her legs. She bled throughout the night.

Nikolas called 911 and gave a description of the intruders and their car.

About sundown the evening before, appellant had arrived at a party about a mile from Nikolas's apartment. He arrived as a passenger in a black Lexus sedan with shiny wheel rims and tinted windows. Lambert had not been invited to the party but had been dating Terri Hazzard, the person giving the party.

04cv1533

Between 1:30 and 2:00 a.m., Jason Riley, who was waiting for a girl he had arranged to see at the Hazzard party, noticed a black Lexus sedan in the parking lot. He was not sure the car had been there when he left earlier for the liquor store. About 10 minutes later, appellant, who had been standing with a shorter man, approached Riley and asked for a ride. Riley knew him slightly. They left in Riley's girlfriend's black Mazda sedan. Riley drove down Mission Bay Drive to Interstate 8.

As Riley and appellant reached the on ramp to Interstate 8, they were spotted by San Diego Police Officer David Achenbach, who had heard the descriptions of the suspects and their vehicle from Nikolas's home invasion. He called for backup support and pulled along side the Mazda. He could clearly see appellant. As the Mazda pulled onto Interstate 805 south, one of the police officers activated his car's overhead lights to stop Riley. Riley took the first exit and stopped the car. He surrendered but appellant ran down the sidewalk between two buildings. A neighborhood search began and lasted about an hour. A red baseball cap and fanny pack appellant was wearing were found on a walkway between the two buildings. The fanny pack contained $21 in assorted change, a loaded pistol stolen earlier that year and a watch belonging to Nikolas's roommate.

At about 2:30 a.m. James Pfeiffer was working on his trucks at his North Park home when he saw police all over the area. He allowed police to come up to his roof to look around. He then went into his house. As he prepared to get ready for bed, his wife heard something and his dog "just went nuts." Pfeiffer went outside to check on the noise and encountered appellant standing on a stairway. Appellant told him "Shut up. Give me your phone and I'll give you 50 bucks." Pfeiffer responded "I'll be right back." He returned with a shotgun. Appellant was arrested. The time of the arrest was 2:50 a.m.

Appellant told the police his name was Randy Smith. When searched, he had in his possession two $20 bills, three $5 bills, two $1 bills, three silver dollars, four 50 cent pieces, five Susan B. Anthony dollars and an Italian 50 lire piece. Five $20 bills were found in his sock. Nikolas's roommate later identified several of the 50 cent pieces, some silver dollars and Susan B. Anthony coins as those taken from his room.

Police located Hazzard's Lexus. Appellant's prints were on the driver's side of the trunk lid. Lambert's were on the driver's side door handle and passenger side of the trunk lid.

On the afternoon of July 27, appellant telephoned Terri Hazzard. When she asked why he had taken her car, he did not answer. He did, however, want to know what happened when police came to her residence.

(Lodgment 15 at 1-5.)

## Discussion

Petitioner asserts three claims in his federal petition. He claims: (1) the trial court violated his Sixth and Fourteenth Amendment rights when it denied his request for appointment of new counsel pursuant to People v. Marsden, 2 Cal. 3d 118, 123-24

04cv1533

(1970) (holding that, although the right to discharge court-appointed counsel and substitute new counsel is within the discretion of the trial court, defendant is entitled to new counsel if the defendant's right to counsel would be substantially impaired by continuing with the original attorney); (2) the trial court violated his Sixth and Fourteenth Amendment rights when it denied his request to represent himself pursuant to Faretta v. California, 422 U.S. 806 (1975) (holding that defendant has a Sixth Amendment right to conduct his own defense, provided he knowingly and intelligently waives his right to counsel); and (3) that he received ineffective assistance of counsel because his attorney: (a) failed to adequately investigate and present his case, including his decision not to request DNA testing, (b) opposed Petitioner's requests for a new attorney and to represent himself, and (c) failed to call Elizabeth J.'s attending physician to rebut the testimony of the Sexual Assault Response Team ("SART") nurse.[6]   Additionally, in his supplemental briefing, Petitioner asserts that post-conviction DNA results substantiate his ineffective assistance claims and show that he is innocent of the crimes of which he was convicted.

## 1.   Standards of Review

### A.   Review of Magistrate Judge's Report and Recommendation

The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party objects to any portion of the report, the district court "shall make a *de novo* determination of those portions of the report . . . to which objection is made." Id.  The Court reviews de novo the magistrate judge's conclusions of law.  Britt v. Simi Valley Unified School Dist., 708 F.2d 452, 454 (9th Cir. 1983) overruled on other grounds by United States v. Reyna-Tapia, 328 F.3d 1114, 1121-22 (9th Cir. 2003).

### B.   Scope of Review of 28 U.S.C. § 2254 Petition

Title 28, United States Code, § 2254(a) sets forth the following scope of review

---

[6] While Petitioner lists his claims of ineffective assistance of counsel as two separate grounds for relief in his petition, the Court will address them together.

for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State Court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a) (West Supp. 2003).

This action is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. § 2254(d), as amended by the AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision may be found "contrary to" clearly established Supreme Court precedent: "(1) if the state court applies a rule that contradicts the governing law set of forth in [the Court's] cases or (2) if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state-court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407.  Alternatively, an unreasonable application may be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

"[A] federal habeas court may not issue the writ simply because the court

- 8 -

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly . . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to dicta, of [the United States Supreme] Court's decisions." Williams, 529 U.S. at 412. A state court need not cite to Supreme Court precedent in ruling on a habeas corpus petition. Early v. Packer, 537 U.S. 3, 8 (2002). Indeed, the state court need not even be aware "of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Id.

Habeas relief is also available if the state court's adjudication of a claim, "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court." 28 U.S.C. § 2254(d)(2). In order to satisfy this provision, Petitioner must demonstrate that the factual finding upon which the state court's adjudication of his claim rests, assuming it rests on a factual determination, is objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). This Court will presume the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Finally, where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by Lockyear, 538 U.S. at 75-76); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

/ / /

/ / /

1    **2.      Analysis**

2         **A.      Petitioner's Request for New Counsel**

3         Petitioner's first claim is that his Sixth and Fourteenth Amendment rights were

4    violated when the trial court denied his request for new counsel.  (Pet. at 8.)  Petitioner

5    argued at trial that his counsel was unprepared, and he argues that the trial court

6    conducted an inadequate inquiry about counsel's performance.  Id.  Petitioner also

7    asserts that, because his attorney was not adequately prepared, he did not represent

8    Petitioner adequately.  (Traverse at 20-23.)

9         The denial of a motion to substitute counsel is properly addressed in federal

10   habeas review because it implicates a defendant's Sixth Amendment right to counsel.

11   See e.g., Schell v. Witek, 218 F.3d 1017, 1021 (9th Cir. 2000).  In reviewing a denial

12   of a request for substitute counsel, courts must consider "(1) the timeliness of the

13   motion; (2) the adequacy of the trial court's inquiry; and (3) the extent of the conflict

14   created."  United States v. Nguyen, 262 F.3d 998, 1004 (9th Cir. 2001); Schell, 218

15   F.3d at 1025.  The trial court must conduct an "appropriate inquiry into the grounds for

16   such a motion, and [ ] the matter [must] be resolved on the merits before the case goes

17   forward."  Schell, 218 F.3d at 1025.  A federal court conducting habeas review must

18   determine the constitutional question of whether the state trial court's denial of the

19   Marsden motion "actually violated [the petitioner's] constitutional rights in that the

20   conflict between [the defendant] and his attorney had become so great that it resulted

21   in a total lack of communication or other significant impediment that resulted in turn

22   in an attorney-client relationship that fell short of that required by the Sixth

23   Amendment."  Id. at 1026; see also LaGrand v. Stewart, 133 F.3d 1253, 1276-77 (9th

24   Cir. 1998) (noting particularly the Supreme Court's instruction that a defendant has no

25   right to a meaningful relationship with counsel, but only a right to an ability to

26   communicate).

27        The Supreme Court has stated that the Sixth Amendment requires that an accused

28   have "'counsel acting in the role of an advocate.'"  United States v. Cronic, 466 U.S.

648, 656-67 (1984) (quoting Anders v. California, 386 U.S. 738, 743 (1967)). "[T]he essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1988); see also Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir. 1990) (holding that there is no automatic right to new counsel simply because a defendant is dissatisfied).

Under Nunnemaker, because the state supreme court summarily denied Petitioner's petition for review, (Lodgment 17), the Court must review the state appellate court's opinion on this issue. 501 U.S. at 801-06. In denying Petitioner's appeal, the state appellate court reviewed the record of Petitioner's Marsden hearing and explained:

> As we have pointed out, appellant met with his attorney, obtained the preliminary hearing transcript and was provided the materials necessary for discovery. Counsel followed leads supplied by the appellant, without success. An eyewitness expert called by codefendant Lambert was used by appellant's counsel.
>
> Nor does the record support the conclusion appellant and counsel had an irreconcilable conflict. In essence, appellant argued below that he did not trust his counsel, who he felt was not safeguarding his rights. He wanted him 'checked out.' These are not sufficient bases to support substitution of counsel (internal citations omitted).

(Lodgment 15 at 9-11.)

First, the record does not reveal a conflict or total lack of communication between Petitioner and his attorney; in fact, it establishes that counsel advocated for Petitioner and assisted his defense. Schell, 218 F.3d at 1026. The record establishes that Petitioner and his attorney were communicating and met on several occasions for a total of approximately 90 minutes. (Lodgment 5, Reporter's Appeal Transcript, Vol. 1A ("RT, Vol. 1A"), at 9-15.) Petitioner never indicated an inability or even an unwillingness to communicate with his counsel, nor did he describe the existence of any significant impediment in their attorney-client relationship. (See e.g., id. at 7.) Rather, Petitioner merely complained that he did not believe his attorney had adequately prepared, that more investigation should have been done, and that he was

concerned his attorney withheld evidence. (<u>Id.</u> at 1-19.)  The trial court addressed each of Petitioner's concerns at the <u>Marsden</u> hearing, even ordering the production of redacted discovery. (<u>Id.</u> at 15.)  Ultimately, the trial court concluded that Petitioner was generally dissatisfied with counsel's performance and the evidence supporting his defense up to the point of the <u>Marsden</u> hearing.  (<u>Id.</u> at 1-19.)  Without more, this is insufficient to require the appointment of new counsel.  <u>Schell</u>, 218 F.3d at 1026; <u>Nguyen</u>, 262 F.3d at 1004.

Second, the record further supports the appellate court's conclusion that Petitioner's <u>Marsden</u> hearing and the court's denial of Petitioner's request complied with the Sixth Amendment.  <u>See</u> <u>Schell</u>, 218 F.3d at 1025.  Over the course of a two-day <u>Marsden</u> hearing, the trial court conducted a thorough and appropriate inquiry into Petitioner's request and allegations. (Lodgment 4, Reporter's Appeal Transcript, Vol. 1 ("RT, Vol. 1") and RT, Vol. 1A.)  At the hearing, Petitioner raised several allegations to support his motion for new counsel, essentially arguing that counsel had not prepared diligently and that his decision not to request DNA testing had prejudiced Petitioner. (RT, Vol. 1A, at 1-19.)  The trial court determined, however, that counsel had met with Petitioner for at least 90 minutes leading up to trial and had complied with Petitioner's requests concerning discovery. (<u>Id.</u> at 7, 14-16.)  Petitioner's attorney also explained that he had hired an investigator, but there was not much investigation to be conducted given Petitioner's factual statements and other evidence in the case. (<u>Id.</u> at 9-13.)  He also explained that none of Petitioner's suggested leads had proved helpful to his case.  (<u>Id.</u>).  Finally, as both the trial and appellate courts noted, defense counsel's recitation of the facts and handling of the case in general, both at the <u>Marsden</u> hearing at throughout trial, demonstrated that he was sufficiently prepared to represent Petitioner adequately.

Finally, Petitioner did not request new counsel until the day trial was scheduled to begin. (RT, Vol. 1, at 4-5.)  As the trial court noted, Petitioner's late request, if granted, would have been disruptive to the trial schedule and his co-defendant. (RT,

1  Vol. 1A, at 30.)

2      For the reasons stated above, the Court concludes that the state court's denial of

3  Petitioner's request for new counsel was neither contrary to, nor an unreasonable

4  application of, clearly established Supreme Court law.  See 28 U.S.C. § 2254(d); see

5  also Williams, 529 U.S. at 412-13.  Accordingly, the Court DENIES Petitioner relief

6  as to this claim.

7      **B.    Petitioner's Request for Self-Representation**

8      Petitioner next argues that the trial court erred when it denied his request to

9  represent himself pursuant to Faretta v. California, 422 U.S. 806 (1975).  (Pet. at 7.)

10  The Sixth Amendment provides that a defendant in a state-court proceeding has an

11  absolute right to be represented by counsel.  Faretta, 422 U.S. at 806, 807.  This right

12  also implicitly guarantees the corresponding right to self-representation.  Id. at 821,

13  832; United States v. Erskine, 355 F.3d 1161, 1167 (9th Cir. 2004).  In order to

14  successfully invoke the right to self-representation, the defendant's waiver of counsel

15  must be "timely, not for the purposes of delay, unequivocal, and knowing and

16  intelligent."  Erskine, 355 F.3d at 1167.

17      While the Supreme Court did not specifically address the timeliness requirement

18  in Faretta, it did state a request made "weeks before trial," 422 U.S. at 807, or one made

19  "well before the date of trial," id. at 835, would be sufficient.  In light of the ambiguity

20  in Faretta, the Ninth Circuit has held that courts are free to establish their own

21  timeliness standards so long as they comport with the Supreme Court's holding in

22  Faretta.  Marshall v. Taylor, 395 F.3d 1058 (9th Cir. 2005).  In Marshall, the Ninth

23  Circuit addressed the timeliness issue in the context of a habeas appeal, upholding a

24  California court of appeal decision that a Faretta request made the morning of trial was

25  untimely.  Id. at 1061.  The court noted that "because the request fell well inside the

26  'weeks before trial' standard established by Faretta, the [state] court of appeal's finding

27  of untimeliness clearly comports with Supreme Court precedent."

28      Here, the facts are similar to those in Marshall.  Petitioner did not indicate his

1   desire to represent himself until January 19, 2000, the day that trial was scheduled to

2   begin. (RT, Vol. 1A, at 19.)  The trial court denied Petitioner's request as untimely.

3   (Id. at 19, 21, 29-30.)  The appellate court stated:

4

5           To be deemed timely, it should have been brought within a
        reasonable time prior to trial.   (Internal citation omitted.)   It was

6       incumbent upon appellant to explain the reason for the late request,
        demonstrate his need for the request was of recent origin and show there

7       was a basis for dissatisfaction with trial counsel.   (Internal citations
        omitted).

8           Here the principle [sic] basis for appellant's request was that he had
        not reviewed all the evidence.  The trial court confirmed appellant was

9       aware of the evidence and witnesses presented at the preliminary hearing
        and assured appellant he would have the police reports to examine the

10      next morning.  Given the concerns articulated by appellant and the late
        request to represent himself, we cannot conclude the trial court abused its

11      discretion in denying his *Farretta* [sic] motion as untimely.

12   (Lodgment 15 at 11-12.)

13       Petitioner argues that he was unable to bring his motion at an earlier date due to

14   his counsel's "deceit and lack of communication." (Traverse at 26.)   Petitioner

15   provides no specific support for these allegations, however, and the record reveals the

16   opposite to be true.  For instance, as the Court noted above, Petitioner's Marsden

17   hearing revealed that his counsel had supplied him with investigative reports and that

18   they had met on at least three separate occasions for approximately 90 minutes before

19   trial. (RT, Vol. 1A, at 7, 14-16.)  Furthermore, Petitioner is unable to demonstrate a

20   sufficient basis for dissatisfaction with counsel.  Based on this evidence and the record

21   as a whole, the Court concludes that Petitioner was not prohibited from bringing his

22   motion for self-representation in a more timely manner.

23       Accordingly, the Court concludes that the state court's denial of Petitioner's

24   claim regarding his Faretta motion was neither contrary to, nor an unreasonable

25   application of, clearly established Supreme Court law.  See 28 U.S.C. § 2254(d); see

26   also Williams, 529 U.S. at 412-13.  Therefore, the Court DENIES Petitioner relief on

27   this claim.

28   / / /

C.   **Ineffective Assistance of Trial Counsel**

Next, Petitioner asserts that he received ineffective assistance of counsel.  First, he claims that his trial counsel failed to adequately investigate and present his case. (Pet. at 6.)  Specifically, Petitioner claims that his attorney failed to follow up on leads, failed to retain experts, and failed to have evidence tested for DNA matches and exclusions.  (Id.)  As additional support, Petitioner asserts that the results of post-conviction DNA testing substantiate these ineffective assistance allegations and prove that he did not commit the crimes of which he was convicted.  (See Suppl. Traverse at 2 (arguing that "newly discovered" DNA results from bed sheet excluded Petitioner as source of DNA found on bed sheet); Suppl. Brief at 2-3, 5 (although DNA testing on wristwatch, hairs recovered from bed, and victim's sweatpants do not affect Petitioner's claims, arguing that absence of victim's blood and DNA from Petitioner's penile and pubic swabs proves he did not have intercourse with the victim); 2nd Suppl. Brief at 2-5 (arguing that DNA results from penile and pubic swabs prove beyond reasonable doubt that Petitioner is innocent of the crimes for which he was convicted).  Second, Petitioner claims that he received ineffective assistance of counsel during his Marsden and Faretta hearings because his attorney allegedly lied to the court about his trial preparation.  (Pet. at 6; Traverse at 19-27.)  Third, Petitioner contends that the failure of his trial counsel to call a particular witness for the purposes of impeaching the testimony of another witness also resulted in the ineffective assistance of counsel. (Pet. at 9-9a; Traverse at 27-28.)

The Supreme Court established the applicable law governing the ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  First, Petitioner must show that counsel's performance was deficient.  Strickland, 466 U.S. at 687.  "This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.  Second, Petitioner must establish counsel's deficient performance prejudiced the defense.  Id.  This requires a showing that counsel's errors were so serious they

deprived Petitioner "of a fair trial, a trial whose result is reliable." Id.  To satisfy this standard, Petitioner must show a reasonable probability that the result of the proceeding would have been different but for the error.  Strickland, 466 U.S. at 694; Williams, 529 U.S. at 406.  The prejudice analysis is to be considered in light of the strength of the prosecution's case.  See Luna v. Cambra, 306 F.3d 954, 966 (9th Cir. 2002), amended, 311 F.3d 928 (9th Cir. 2002).

    As noted above, Petitioner filed two separate habeas petitions with state courts. In the first, he raised the first two aspects of his ineffective assistance of counsel claim, and in his second habeas petition, he raised his last ineffective assistance of counsel argument.  Because the California Supreme Court summarily rejected both habeas petitions, the Court must "look through" to the California Court of Appeal's decision as the basis for its analysis for the first two ineffective assistance of counsel claims and to the California Superior Court's decision for the last ineffective assistance of counsel claim, as Petitioner's second habeas petition also was summarily rejected by the California court of appeal.  See Nunnemaker, 501 U.S. at 801-06.  Having considered Petitioner's ineffective assistance of counsel claims and the relevant state-court decisions, the Court will now address each in turn.

## i.    Failure to Investigate and Present Testimony

    Petitioner's first claim is that his trial counsel failed to adequately investigate his case. (Pet. at 6.)  Specifically, Plaintiff contends that his attorney failed to interview all persons at the Hazzard party to locate the real perpetrator, failed to locate Petitioner's girlfriend who may have testified to having given Petitioner an Italian coin, and failed to explain to the jury that Petitioner fled from the police prior to his arrest because he was on parole and there was an active arrest warrant for him unrelated to this matter. (Traverse at 12-14.)  Petitioner also argues that his attorney was ineffective because he declined to have DNA testing done on evidence found at the crime scene. Id. at 15-17.  Since filing his traverse, Petitioner has had DNA testing done that he asserts excludes him as a source of DNA found on evidence recovered from the crime

scene. (Suppl. Traverse at 2; Suppl. Brief; 2nd Suppl. Brief.) Petitioner argues that the lack of DNA testing prejudiced him because numerous people are exonerated by negative DNA results. (Traverse at 15-18; Suppl. Brief; 2nd Suppl. Brief. )

In denying this ineffective assistance of counsel claim, the appellate court stated:

With respect to communication with counsel, the record reflects counsel and appellant met three times for 30 minutes each. He was able to tell counsel what he wanted to tell him and by the time of the trial he had received the preliminary hearing transcript and had met with the investigator. Notably, trial counsel indicated he and the investigator met with appellant twice and attempted to do the things appellant wanted done. Unfortunately, nothing he wanted done was fruitful for the defense.

Appellant urges trial counsel could have conducted more investigation, called additional witnesses and been a more effective speaker and advocate. However, counsel did have all discovery available, hired a private investigator, presented exculpatory witnesses and used the eyewitness identification expert called by his codefendant Lambert. While appellant counsel presents additional steps that could have been taken, such as testing DNA and hiring a DNA expert, such additions might well have produced results appellant was not willing to confront. Trial counsel concluded the case required no motions or experts beyond that produced by Lambert. Indeed, he noted the People had not completely tested DNA and he did not wish to elaborate on DNA matches. He noted the facts of the case were simple. Based on the record, we conclude trial counsel's case preparation and presentation were reasonable.

In any event, we conclude no prejudice resulted to appellant due to trial counsel's representation. We simply cannot say the result of the case would have been any different if the alleged ineffectiveness was present. The evidence against appellant was overwhelming. Elizabeth and Nikolas had ample opportunities to see their attackers and they both positively identified appellant as the home invader and assailant of Elizabeth. Appellant had access to a black Lexus and that Lexus was described by Elizabeth as the one she saw appellant in. His fingerprints were on the drivers' side of the trunk lid and Lambert's were on the drivers' door handle and passenger side of the trunk lid. Unique personal property such as the Italian lire matching that taken in the robbery was found on appellant a the time of his arrest. Denominations of money matched that taken. Appellant ran from police when stopped, offered a member of the public $50 not to turn him in and gave a false name to police when arrested. A red hat found near the scene of appellant's arrest was identified by Elizabeth as that worn by appellant during the crimes. Given the overwhelming nature of the evidence and its solid evidentiary value, we are hard-pressed to believe anything suggested by appellant now could have changed the outcome of the case.

. . . .

Moreover, with respect to appellant's argument there had been no DNA testing, his counsel explained the DNA sample was not sufficient to link appellant to the crime and he felt it would jeopardize appellant if

- 17 -

04cv1533

1    he insisted on further testing.  He gave a detailed explanation of what he
2    had done and why his efforts had or had not been fruitful.

3         Appellant urges that if we conclude the record does not support
     ineffective counsel it is because counsel inaccurately stated he was ready
4    for trial when he was not.  As we have pointed out in the preceding
     argument, the record of the trial does not support such an assertion.

5    Lodgment 15, at 7-10.

6                      **a.     Failure to Investigate**

7         The Supreme Court has held that "counsel has a duty to make reasonable

8    investigations or to make a reasonable decision that makes particular investigations

9    unnecessary."  Wiggins v. Smith, 539 U.S. 510, 520 (2003).  Choosing to forego a

10   particular investigation must be a "reasoned choice."  Id.  While a lawyer's failure to

11   investigate crucial witnesses may indicate an inadequate investigation, "counsel need

12   not interview every possible witness to have performed proficiently."  Riley v. Payne,

13   352 F.3d 1313, 1318 (9th Cir. 2003); see also Huffington v. Nuth, 140 F.3d 572, 580

14   (4th Cir. 1998) (noting that "the failure to investigate everyone whose name happens

15   to be mentioned by the defendant does not suggest ineffective assistance.").  "Strategic

16   choices made after thorough investigation of law and facts relevant to plausible options

17   are virtually unchallengeable . . . ."  Strickland, 466 U.S. at 690.

18        As detailed above, Petitioner's trial counsel described at some length the extent

19   of his pre-trial investigations when questioned by the trial court judge at the Marsden

20   hearing.  (RT, Vol. 1A.)  Despite efforts of both trial counsel and the retained

21   investigator, potential leads did not yield any helpful information to Petitioner's

22   defense.  (Id. at 9-13, 17-19.)  Additionally, none of the additional investigation

23   suggested by Petitioner involved crucial witnesses or critical information.  For instance,

24   the testimony of Petitioner's former girlfriend that she may have given him an Italian

25   coin is weak in light of the overwhelming evidence of guilt.  (Traverse at 12-14.)

26   Moreover, trial counsel stated in his declaration that Petitioner never told him to

27   contact his former girlfriend, that Petitioner did not provide any facts or witnesses to

28   establish an alibi, that Petitioner decided not to testify, and that although he tried to

locate additional witnesses, he was unsuccessful because they were uncooperative, unhelpful, or damaging to Petitioner's case . (CT2 at 301-303.)

Petitioner has failed to demonstrate that his attorney was constitutionally deficient in his conduct. See Wiggins, 539 U.S. at 520. The appellate court determined that "trial counsel's preparation and presentation were reasonable." (Lodgment 15 at 8.) Furthermore, some of the challenged decisions to not pursue certain avenues were reasonable tactical decisions made by trial counsel. See Strickland, 466 U.S. at 690; Wilson v. Henry, 185 F.3d 986, 991 (9th Cir. 1999) (determining tactical decision to allow jury to learn defendant was in custody was reasonable and did not constitute ineffective assistance of counsel). Accordingly, in light of the presumption that trial counsel's performance was within the broad range of constitutionally reasonable representation, the Court concludes that the appellant court did not commit an unreasonable application of clearly established law in denying Petitioner's claim of ineffective assistance of counsel on these grounds. See 28 U.S.C. § 2254(d); see also Williams, 529 U.S. at 412-13.

### b.    DNA Evidence

Petitioner argues that his trial counsel was ineffective because he failed to obtain DNA testing results. Further, in supplemental briefing, Petitioner asserts that the results of post-conviction DNA testing substantiate his ineffective assistance claim and show that he is innocent of the crimes of which he was convicted. (Suppl. Traverse at 2; Suppl. Brief at 2-3, 5; 2nd Suppl. Brief at 2-5.) The Court has already granted Petitioner's request to expand the record to include the results of the post-conviction DNA testing. As explained below, considering the DNA results, trial counsel's decision not to pursue DNA testing was a reasoned tactical decision entitled to deference.[7]  See, e.g., Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (trial

---

[7] The Court finds that Petitioner exhausted his ineffective assistance of counsel claim premised on his attorney's decision not to request DNA testing on evidence obtained from the crime scene. (See Lodgment 17.) Even though the post-conviction DNA results could be considered new evidence not presented to the state courts, "new factual allegations do not render a claim unexhausted unless they

1   counsel's tactical decisions deserve deference when counsel bases trial conduct on

2   strategic considerations, makes an informed decision based upon investigation, and the

3   decision appears reasonable under the circumstances).

4                    **(1)     Summary of Post Conviction DNA Testing**

5          In his supplemental traverse, Petitioner submitted the results of DNA testing

6   conducted on a bed sheet taken from the crime scene.  (Suppl. Traverse, Ex. B.)  The

7   victim and Petitioner were excluded as possible sources of the DNA material present

8   on the bed sheet.

9          Next, at the request of Petitioner's state court-appointed counsel, Forensic

10   Science Associates conducted DNA testing on several items of evidence related to

11   Petitioner's criminal case: (1) a wristwatch bearing the inscription "With All My Heart,

12   Love Jen" belonging to the male victim's roommate; (2) black sweatpants worn by

13   Elizabeth J. and two cuttings taken from the pants; (3) hairs recovered from a bed sheet

14   found at the crime scene; and (4) biological material recovered from Petitioner's penile

15   and pubic swabs.  (See Suppl. Report on DNA Testing)

16          After testing the wristwatch, Forensic Science Associates concluded that neither

17   Elizabeth J. nor Petitioner were likely contributors to the trace level alleles detected in

18   the wristwatch samples.  (Id. at 30-31.)  Further, the report stated: "It is not apparent

19   that the cellular debris from the wrist watch . . . can contribute to resolving

20   [Petitioner's] claim in this case."  (Id. at 32.)  Regarding the sweatpants, the report

21   concluded that the limited quantity of spermatozoa collected from the samples was

22   inadequate for successful genetic analysis.  (Id. at 15-21.)  Accordingly, the lab did not

23   perform any additional testing on the samples.  (Id. at 18, 20-22.)  As to the hairs

24   collected from the bed sheet, Forensic Science Associates found that two short hairs

25   collected were capable of mitochondrial DNA analysis.  (Id. at 22-23.)  Nevertheless,

26   ────────────────

27   'fundamentally alter the legal claim already considered by the state courts.'"  Chacon v. Wood, 36 F.3d 1459, 1468 (9th Cir. 1994) (quoting Vasquez v. Hillery, 474 U.S. 254 (1986), overruled on other grounds, 8 U.S.C. § 2254(c).  Here, the DNA results do not fundamentally alter Petitioner's claim, and

28   the state courts had the opportunity to review the ineffective assistance claim premised on the lack of DNA testing.  Additionally, the Court previously expanded the record to include the DNA test results.

the lab did not perform further analysis because "found hairs on bedding from the victim in this case can only provide inculpatory evidence; it cannot provide exculpatory evidence that could logically undermine any defendant's prior conviction because it cannot be proven that these hairs originate from an assailant." (Id. at 23.) In sum, as Petitioner concedes, the results of testing on the wristwatch, sweatpants, and hair samples were inconclusive and do not affect his claims. (Suppl. Brief at 2-3.)

Finally, the lab tested two penile swabs and two pubic swabs collected from Petitioner upon his arrest. (Id. at 6-9.) Of the two penile swabs submitted for testing, one had been consumed during previous examinations conducted by the San Diego Police Department. The other penile swab was entirely intact, however, and microscopic examination revealed a low level of epithelial cells, a moderate number of dermal cells, and no spermatozoa. (Id. at 6-8.) DNA analysis revealed that the genetic material obtained from the penile swab matched Petitioner's genetic profile. (Id. at 29.) Of the two pubic swabs, one was unconsumed, and microscopic examination revealed a low level of dermal cells and no spermatozoa. (Id. at 9.) The report stated that the pubic swab may have contained a trace level of DNA from a second party, but Elizabeth J. was eliminated as the source of this genetic material. (Id. at 30.) In sum, the lab concluded that Elizabeth J.'s cellular material was absent from the penile and pubic swabs. (Id. at 31.) The report also noted that "vaginal epithelial cells survive on an unwashed post coital penis for approximately one to two days after intercourse." (Id. at 3.)

### (2) Counsel's Decision Not to Request Additional DNA Testing

The decision whether to request DNA testing is a tactical decision. See e.g., Karis v. Calderon, 283 F.3d 1117, 1131 (9th Cir. 2002) (holding that it was not ineffective assistance where counsel did not move to exclude genetic-marker testing evidence on basis that the scientific method was unreliable where counsel challenged the evidence in other ways). Reasoned tactical decisions are entitled to deference.

Ratelle, 21 F.3d at 1456.  "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Wiggins, 539 U.S. at 520.  Finally, as the Supreme Court has explained, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.

With regard to trial counsel's decision not to request additional DNA testing, the appellate court stated:

> While appellant counsel presents additional steps that could have been taken, such as testing DNA and hiring a DNA expert, such additions might well have produced results appellant was not willing to confront.
>
> Trial counsel concluded the case required no motions or experts beyond that produced by Lambert.  Indeed, he noted the People had not completely tested DNA and he did not wish to elaborate on DNA matches. He noted the facts of the case were simple.  Based on the record, we conclude trial counsel's case preparation and presentation were reasonable.

(Lodgment 15 at 8.)

Here, trial counsel made a reasoned, strategic choice not to pursue DNA testing at trial.  (RT, Vol. 1A, at 13, 17-19, 28-29.)  In explaining his reasoning, trial counsel told the trial judge that he did not know what the result of the testing would be, and because the government did not have any DNA evidence supporting its allegations, he preferred to argue to the jury that the government had no physical evidence and had done a poor job investigating the case.  (Id.)  Thus, trial counsel expressly adopted a trial strategy for which the fact that the biological evidence had not been tested was crucial: that the prosecution's case was completely lacking in DNA, blood, or fingerprint evidence connecting Petitioner to the crime.  (Id.; Lodgment 10 at 18-19 (opening statement emphasizing absence of biological evidence linking Petitioner to crimes); Lodgment 8 at 699-701 (closing argument reiterating same).)  By adopting this strategy, counsel was able to call into question both the adequacy of the prosecution's investigation and the strength of its case with little risk to Petitioner.

Moreover, the results of the DNA tests on the bed sheet and swabs do not alter the fact that DNA evidence was not critical in this case.  Importantly, the jury convicted

Petitioner despite the fact that the government did not have physical evidence connecting Petitioner to the crime, a fact Petitioner's counsel established through testimony and repeated argument. (Lodgment 6, Reporter's Appeal Transcript, Vol. 2 ("RT, Vol. 2") at 247-51, 373-77; Lodgment 7 at 502; Lodgment 10 at 18-19; Lodgment 8 at 699-701.) The post-conviction DNA evidence does not significantly affect this argument because it only corroborates evidence already submitted at trial. Counsel still would have argued that there was no DNA or blood evidence tying Petitioner to the crime; it only would have slightly increased the strength of the argument. When viewed from counsel's perspective without the benefit of hindsight, this potential, slight benefit could reasonably be outweighed by the possible negative consequences. See LaGrand, 133 F.3d at 1271.

Examining trial counsel's decisions, the record indicates that he considered his relevant plausible options after conducting his investigation and arrived at a reasoned decision not to have DNA testing performed on the grounds that the results might present evidence he would be unable to refute. See Strickland, 466 U.S. at 690; Smith v. Stewart, 140 F.3d 1263, 1272 (9th Cir. 1998) (rejecting petitioner's claim that court's refusal to grant continuance to allow for processing of a neutron activation test violated due process by emphasizing, among other things, that "the test could have sunk [petitioner's] defense that he did not commit the murder"); Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) (in finding no prejudice in counsel's failure to test blood found at crime scene, noting that "it was plausible that, having considered the matter, defense counsel made a strategic decision not to pursue this line of evidence because they feared that [petitioner's] blood *would* be found") (emphasis in original); Pratt v. Kernan, No. C 05-2062, 2007 WL 163246, at *4 (N.D. Cal. Jan. 19, 2007) (finding no ineffective assistance of counsel where attorney made reasoned tactical decision not to pursue DNA testing because if blood were tested and matched petitioner, "it would be fatal to [the mistaken identity] defense").

Further, in evaluating the sufficiency of counsel's representation, courts should

not "second-guess counsel's decisions, nor apply the fabled twenty-twenty hindsight." LaGrand, 133 F.3d at 1271.  Indeed, evaluating an attorney's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.  In this case, trial counsel had to decide whether to request DNA testing without knowing what the results would be.  In making this decision, counsel knew that without the testing, the government did not have DNA evidence, fingerprints, or blood evidence tying Petitioner to the crimes, and he would be able to argue the paucity of the government's case and evidence.  He also knew that while negative DNA results might enhance Petitioner's defense that he did not commit the crimes, the results would not be exonerating because substantial other evidence, including eyewitness identifications, tended to show that Petitioner committed the crimes.  Additionally, counsel knew that test results placing Petitioner's DNA on the victim or vice versa would be devastating to Petitioner's defense.  Given this knowledge and choice, regardless of the ultimate results of testing, counsel's trial tactics and reasoned decision not to pursue DNA testing and instead to argue vigorously the government's lack of physical evidence cannot be labeled ineffective assistance.  In total, counsel's decision to proceed without DNA testing did not render his services "outside of the wide range of professionally competent assistance," and thus, ineffective assistance of counsel. Strickland, 466 U.S. at 688.

Furthermore, the Court notes that Petitioner did not suffer prejudice because the post-conviction DNA results were not presented at trial.  This is not a case where the government used incorrect DNA results to convict Petitioner or where new DNA results would potentially exonerate Petitioner.  The overwhelming evidence against Petitioner, including the two witnesses' positive identifications, Petitioner's flight from police, and his possession of items stolen from the crime scene, would not have been overcome by the addition of this marginally helpful evidence.  Accordingly, Petitioner

04cv1533

did not suffer any prejudice as a result of his counsel's decisions regarding DNA evidence.  See Strickland, 466 U.S. at 687.  Accordingly, the Court concludes that Petitioner has not established either Strickland prong and DENIES Petitioner relief as to his ineffective assistance of counsel claim.

### (3)    Petitioner's Assertion of Innocence

In his supplemental briefing, in arguing the relevance of the post-conviction DNA testing results on his ineffective assistance claims, Petitioner states that the test results show that he is innocent of the sexual assault crimes.  In an abundance of caution, the Court construes Petitioner's briefing to be asserting an actual innocence claim.

The Supreme Court has explained that actual innocence claims may be either procedural or substantive.  Schlup v. Delo, 513 U.S. 298, 313-14 (1995).  In a procedural claim, a petitioner asserts actual innocence as a gateway to arguing an otherwise procedurally barred claim.  Id.  In other words, passing through the Schlup gateway does not entitle a petitioner to a declaration of actual innocence or to any relief, but only permits a federal court to review underlying constitutional claims.  See Smith v. Baldwin, 466 F.3d 805, 812 (9th Cir. 2006).  To succeed in bringing the procedurally barred claim before the habeas court, a petitioner must show that, in light of new evidence,"more likely than not any reasonable juror would have reasonable doubt" regarding the petitioner's guilt.  House v. Bell, 126 S.Ct. 2064, 2077 (2006).  The Supreme Court has noted that this standard "ensures that petitioner's case is truly 'extraordinary,' while still providing petitioner a meaningful avenue by which to avoid a manifest injustice."  Schlup, 513 U.S. at 327 (quoting McClesky v. Zant, 499 U.S. 467, 494 (1991)).  This standard "requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record."  House, 126 S.Ct. at 2078.

In contrast to asserting actual innocence as a gateway to an otherwise procedurally barred claim, petitioners have also attempted to bring freestanding actual

04cv1533

innocence claims in federal habeas corpus proceedings.  In practice, however, the Supreme Court has never explicitly held that a freestanding innocence claim is available during habeas review, even in a death penalty case.  For example, in Herrera v. Collins, 506 U.S. 390 (1993), the Supreme Court assumed without deciding that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."   Id. at 417.  Similarly, the Court revisited the issue and again refused to decide whether a freestanding innocence claim is permissible in a capital case on habeas review, concluding instead that, although petitioner "cast considerable doubt on his guilt" and opened the Schlup gateway, he had not reached the "extraordinarily high" threshold for a freestanding innocence claim.  House, 126 S.Ct. at 2086-87.  The Supreme Court has not explained what a petitioner must show to meet this "extraordinarily high" threshold, but it has noted that the showing is more stringent than the Schlup standard.  Further, according to the Ninth Circuit, a petitioner must "affirmatively prove that he is probably innocent."   Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997); Baldwin, 466 F.3d at 812 (citing Carriger).

Given that the court has considered the post-conviction DNA evidence in resolving Petitioner's ineffective assistance of counsel claims, the Court need not determine whether Petitioner met the Schlup gateway standard for bringing procedurally barred claims.  Therefore, the Court construes Petitioner's briefing as raising a freestanding actual innocence claim.

Reviewing all of the post-conviction DNA evidence, Petitioner falls far short of demonstrating that "more likely than not any reasonable juror would have reasonable doubt" regarding Petitioner's guilt, House, 126 S.Ct. at 2077, and therefore he also fails to meet the more stringent standard for freestanding actual innocence claims, affirmatively proving that he is probably innocent.

First, testing conducted on the wristwatch, sweatpants, and hairs proved

04cv1533

inconclusive, which Petitioner readily concedes.  Second, the results from tests on the penile and pubic swabs are ambiguous at best, and the findings do not significantly affect the evidence supporting Petitioner's convictions.  Indeed, the record indicates that Elizabeth J. used the bathroom during the assault and urinated and wiped her genital area prior to her SART examination, which mitigates the effect of the lack of DNA collected from the victim, crime scene, and Petitioner.  (See, e.g., RT, Vol. 1, at 193 (Elizabeth J.'s testimony that she went to the bathroom during the attack but was unable to urinate); id. at 221-22 (Elizabeth J.'s testimony that she used the bathroom after the sexual assault but prior to her SART examination); RT, Vol. 2, at 237 (SART nurse's testimony that Elizabeth J. urinated and wiped her genital area prior to the SART examination).)  While the post-conviction DNA evidence may have bolstered Petitioner's defense, it does not directly contradict any evidence used to convict Petitioner because the government did not present DNA or blood evidence and Petitioner used the lack of such evidence as his defense.  This stands in stark contrast to the types of cases in which courts have found the Schlup standard satisfied.  See, e.g., House, 126 S.Ct. at 2076-78 (Schlup actual innocence satisfied where petitioner's conviction based upon blood evidence found on victim's clothing, which government argued during trial belonged to petitioner but was found after trial to belong to victim's husband, who also confessed to the crime); Carriger v. Stewart, 132 F.3d 463, 478-79 (9th Cir. 1997) (Schlup gateway standard satisfied where petitioner presented sworn affidavit of third party exonerating petitioner and confessing to the murder for which petitioner was convicted).

Moreover, the test results do nothing to undermine the overwhelming evidence of Petitioner's guilt presented during trial.  For example, Elizabeth J. provided extensive testimony that she was forcibly raped and sodomized, that the perpetrator attempted to penetrate her with a foreign object, and that he did penetrate her vaginally and anally with his genitalia.  (RT, Vol. 1, at 189-94, 217, 221.)  The SART nurse provided additional testimony regarding penetration, reciting the victim's injuries and

opining that all of the injuries were consistent with forcible sexual intercourse or forcible sodomy.  (RT., Vol. 2, at 237-44-51.)   Accordingly, the record contains significant evidence establishing penetration, and indeed, Petitioner acknowledges that there was evidence of sexual assault, but argues that he was not the perpetrator.  (See 2nd Suppl. Brief at 3.)

Further, both victims described distinguishing characteristics of the two intruders and positively identified Petitioner as the perpetrator of the sexual assault.  (See RT, Vol. 1, at 136-48, 145-46, 162-70, 176-77, 179-83, 186-95, 200-02.)  Petitioner was taken into custody a short time following the attack, at which point a search uncovered unique personal property matching that taken from the crime scene in Petitioner's possession.  (See id. at 103-04, 174, 178-79; RT, Vol. 2, at 289, 310, 319-22, 324-25.)  Additionally, pursuing officers searching the neighborhood in which Petitioner was last seen and eventually apprehended retrieved a fanny pack containing assorted change, a loaded pistol, and a watch with the inscription "With All My Heart, Love Jen" that belonged to Nikolas S.'s roommate.  (See CT1 at 147; CT2 at 228-32, 288-97, 327-36.)  Finally, Petitioner's conduct immediately after the crimes, specifically his fleeing and hiding from police, pleading with a civilian for help in avoiding the police, and providing a false name to arresting officers, is significant circumstantial evidence that Petitioner was the perpetrator of the crimes.  (See RT, Vol. 2, at 273-74, 286-88, 292-93, 298, 309-11, 312-14, 324.)

Given the overwhelming evidence implicating Petitioner in the crimes, he has failed to meet even the Schlup gateway standard, as he has not demonstrated that, in light of the post-conviction DNA evidence, "more likely than not any reasonable juror would have reasonable doubt" regarding his guilt.  House, 126 S.Ct. at 2077. Accordingly, even if a freestanding innocence claim is available to a petitioner under these circumstances, Petitioner has not met the stricter standard for such a claim because he is far from proving "affirmatively . . . that he is probably innocent." Carriger, 132 F.3d at 476.  In sum, to the extent Petitioner brings an actual innocence

1  claim, that claim fails.  Therefore, the Court DENIES Petitioner relief as to this claim.

2          ii.      Counsel's Objection to Petitioner's **Marsden** and **Faretta**

3                  Motions

4          Petitioner also claims that he suffered ineffective assistance of counsel when his

5  attorney opposed his requests for new counsel and to represent himself.  (Pet. at 6.)

6  Petitioner asserts that counsel made misrepresentations about his trial preparation and

7  his investigatory work to the trial court at the Marsden and Faretta hearings, causing

8  the trial court judge to deny his motions.  (Id.; Traverse at 26.)  Petitioner claims this

9  was ineffective assistance of counsel.  (Pet. at 6.)

10         The appellate court noted that Petitioner's claims made in his Marsden hearing

11 were essentially the same as those he made on appeal to support his ineffective

12 assistance of counsel claim.  Id. at 10.  As stated in the preceding section, the record

13 from Petitioner's Marsden hearing does not support Petitioner's claims.  The appellate

14 court stated:

15         Appellant met with his attorney, obtained the preliminary hearing
           transcript and was provided the materials necessary for discovery.
16         Counsel followed leads supplied by the appellant, without success.  An
           eyewitness expert called by codefendant Lambert was used by appellant's
17         counsel.  Morever, with respect to appellant's argument there had been no
           DNA testing, his counsel explained the DNA sample was not sufficient
18         to link appellant to the crime and he felt it would jeopardize appellant if
           he insisted on further testing.  He gave a detailed explanation of what he
19         had done and why his efforts had or had not been fruitful.

20 Id.  In sum, the appellate court stated that "the record does not support" Petitioner's

21 assertion that his trial counsel inaccurately stated his trial preparation  Id.

22         First, Petitioner has provided no set of facts to support his allegations that trial

23 counsel made purposeful misrepresentations to the trial court during Petitioner's

24 hearings.  Furthermore, he has also failed to provide facts that suggest trial counsel was

25 unprepared for trial.  In fact, the Court's review of the trial and hearing transcripts

26 reveal facts that support the notion that counsel was prepared.  (RT, Vol. 1A.)

27 Specifically, the trial and hearing transcripts demonstrate that counsel had command

28 of the relevant facts, adequately handled the trial, presented supporting witnesses,

effectively cross-examined adverse witnesses, and highlighted arguments and facts that favored Petitioner.  (Lodgments 4-8.)

Second, despite Petitioner's assertions to the contrary, his <u>Marsden</u> and <u>Faretta</u> motions were denied for a variety of other reasons, none of which relied on any alleged misrepresentations by trial counsel.  The appellate court recognized this, noting in response to Petitioner's accusations that counsel inaccurately stated he was ready for trial when he was not that "the record of the trial does not support such an assertion." (Lodgment 15 at 10.)  On the basis of this review, the Court concludes that trial counsel's performance during Petitioner's hearings was not deficient, nor did Petitioner suffer any prejudice by his counsel's actions.    <u>Strickland</u>, 466 U.S. at 694. Accordingly, the Court concludes that Petitioner did not suffer ineffective counsel at his pre-trial hearings.  <u>See id.</u> at 687.  Accordingly, the Court DENIES Petitioner relief as to this claim.

### iii.    Failure to Call Attending Physician to Testify

Petitioner's final argument is that he did not receive effective assistance of counsel because his attorney did not call to testify Dr. Edward Thaler, the attending physician who evaluated Elizabeth J.  (Pet. at 9.)  Petitioner argues that Dr. Thaler's examination of the victim revealed "no lacerations or abrasions" and thus, would have contradicted the nurse's testimony that there were numerous lacerations and abrasions. (<u>Id.</u>)

In denying Petitioner's final ineffective assistance of counsel claim that counsel erred by failing to call the emergency room physician to testify, the superior court stated:

> Petitioner has not demonstrated that his trial counsel's decision to not place the emergency room physician on the stand prejudiced the outcome of his case.
> . . . .
> Even if the testimony of the emergency room physician had been introduced, Petitioner has failed to prove it would reasonably have impacted the outcome of the trial.  Thus, Petitioner has failed to make a prima facie showing that he should be entitled to the relief requested.

(Lodgment 19 at 3-4.)  The superior court also quoted the appellate court's summary of the evidence against Petitioner, concluding that "[g]iven the overwhelming nature of the evidence and its solid evidentiary value, we are hard-pressed to believe anything suggested by appellant now could have changed the outcome of the case."  (See Appellate Opinion, D036645, p. 9).  Id.

The SART nurse testified that she first examined the victim without any magnification and then examined her with the aid of a microscope.  (RT, Vol. 2, at 238.)  The victim was first examined at 3:20 a.m.  (Id. at 236.)  The nurse stated that during the exam, the victim complained of soreness in her vagina and rectum.  (Id. at 237.)  The nurse stated that the victim had eight lacerations or abrasions on the exterior of her genital area that were consistent with rape injuries.  (Id. at 239-41, 244.)  She also testified that the area around the victim's anus was swollen and bruised.  (Id. at 241-42.)  The nurse also noted that she detected some blood in the vaginal canal, but could not determine its source.  (Id. at 242.)  Because of this bleeding, she referred the victim to the emergency room.  (Id.)

The emergency room physician, Dr. Thaler, examined the victim nearly three hours later.  (Lodgement 18, Ex. B.)  The doctor's report indicates he examined her for fifteen minutes and found no evidence of lacerations or active bleeding.  (Id.)  He did, however, note that there was a small amount of blood in the victim's vagina.  (Id.)

Based on the evidence at trial and the medical report of Dr. Thaler, the Court concludes that the testimony of Dr. Thaler would not have affected the outcome of the trial.  Despite Petitioner's arguments to the contrary, overall, Dr. Thaler's report does not contradict the SART nurse's testimony.  First, his exam was conducted nearly three hours after the SART nurse examined the victim.  Further, Elizabeth J. testified that she showered and "cleaned up" before she reported to the emergency room for her examination by the attending physician.  (See RT, Vol. 1, at 196.)  Second, there is no indication that he utilized the same examination instruments as the nurse, most notably a microscope, in examining the victim's external genitalia.  Finally, like the SART

nurse, Dr. Thaler found a small pool of blood in the victim's vaginal canal. Accordingly, Petitioner has not shown that his counsel acted in an ineffective manner with respect to his decision not to call Dr. Thaler to testify. See Strickland, 466 U.S. at 687.

The Court also notes that, in addition to failing to show that his counsel's performance was deficient, Petitioner also failed to show that he was prejudiced by his counsel's actions. See id. As noted above, the strength of evidence against Petitioner was overwhelming. See Luna, 306 F.3d at 966. First, both victims positively identified Petitioner as the assailant and testified that he did not wear a mask or otherwise attempt to obstruct his face. (RT, Volume 1, at 107-11, 180-84.) Elizabeth J. also identified Petitioner as the person who had driven by her in a black Lexus just minutes prior to the attack. (Id. at 187-94, 175-78.) Second, substantial evidence placed Petitioner in immediate area of the attack. (CT2 at 252-66.) Third, officers identified Petitioner as the person who fled when the vehicle in which he was a passenger was stopped. (RT, Vol. 2, at 287-89.) Officers also identified the clothes and fanny pack that Petitioner wore at the time he fled the car. (Id. at 303-04.) As the assailant fled, the pursuing officer testified that the assailant entered into an apartment complex. (Id. at 296-98.) A resident of the apartment complex identified Petitioner as the person who frantically offered him fifty dollars for his cellular phone and not to turn him into the police. (Id. at 311-14.) Fourth, unique personal property and money, including an Italian coin and a personally engraved watch that belonged to the male victim's roommate, were found on Petitioner's person or in items he discarded while attempting to flee from the police. (Id. at 321-30.)

The overwhelming evidence against Petitioner must be considered when evaluating any potential prejudice suffered by him due to alleged ineffective assistance of counsel. See Luna, 306 F.3d at 966. Based on this evidence, the Court concludes that the state court's adjudication of Petitioner's ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, clearly established

04cv1533

1  Supreme Court law.  See 28 U.S.C. § 2254(d); see also Williams, 529 U.S. at 412-13.

2  Accordingly, the Court DENIES Petitioner relief as to this claim.

3  **D.     Petitioner's Request for an Evidentiary Hearing**

4          Finally, Petitioner requests an evidentiary hearing in his briefing.  (Traverse at

5  2; 2nd Suppl. Brief at 6-7.)  Respondent counters that Petitioner is not entitled to an

6  evidentiary hearing.

7          Under 28 U.S.C. § 2254(e)(2), as amended by AEDPA, a district court presented

8  with a request for an evidentiary hearing must first determine whether a factual basis

9  to support the petitioner's claims was developed in the state court.  Williams v. Taylor,

10  529 U.S. 420, 432 (2000); Baja v. Ducharme, 187 F.3d 1075, 1078-79 (9th Cir. 1999).

11  If a factual basis was not developed in the state court, the district court must ascertain

12  whether the failure to develop the factual basis was attributable to Petitioner.  Taylor,

13  529 U.S. at 432 ("[A] failure to develop the factual basis of a claim is not established

14  unless there is a lack of diligence, or some greater fault, attributable to the prisoner or

15  the prisoner's counsel.").  If so, a petitioner is not entitled to an evidentiary hearing

16  unless he establishes one of two narrow exceptions set forth in 28 U.S.C. § 2254(e)(2).

17  If there has been no lack of diligence, however, "the prisoner has not 'failed to develop'

18  the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing

19  compliance with the balance of the subsection's requirements." Id. at 437.; see also

20  Jaramillo v. Stewart, 340 F.3d 877, 882 (9th Cir. 2003).

21          Here, the parties do not dispute that Petitioner did not develop the record in state

22  court.  Further, Petitioner has demonstrated diligence with regard to his ineffective

23  assistance claim premised on the decision to forego DNA testing and any related actual

24  innocence claim.  Nevertheless, Petitioner is not entitled to an evidentiary hearing in

25  this case.  First, the Court has already allowed Petitioner to supplement the record with

26  post-conviction DNA results, and the Court has considered all of Petitioner's new

27  evidence in resolving his petition.  Therefore, Petitioner does not need an evidentiary

28  hearing in order to obtain judicial review of this new evidence.  Second, Petitioner has

not alleged additional facts that, if proved, would entitle him to habeas relief.  <u>See</u> <u>Williams v. Woodford</u>, 384 F.3d 567, 586 (9th Cir. 2004).  As discussed above, the Court has considered all of the new evidence submitted by Petitioner and determined that the new evidence does not entitle him to habeas relief.  The DNA testing results do not exonerate Petitioner or negate or undermine the overwhelming evidence of guilt presented at trial.

Third, Petitioner has not shown what additional, non-speculative evidence would be obtained through an evidentiary hearing.  <u>Griffen v. Johnson</u>, 350 F.3d 956, 966 (9th Cir. 2003) (evidentiary hearing not required where petitioner failed to show that hearing would produce evidence more reliable or probative than that already submitted).  Rather, in supplemental briefing, Petitioner states in conclusory fashion that only an expert could satisfactorily explain to the Court the significance of the absence of Elizabeth J.'s cellular material from the penile and pubic swabs and state with reasonable certainty whether the DNA results exonerate Petitioner.  (2nd Suppl. Brief at 7.)  Petitioner does not provide any evidence or analysis as to why an expert would provide a relevant and probative opinion or explain the scope of any such opinion.  <u>Gandarela v. Johnson</u>, 286 F.3d 1080, 1087 (9th Cir. 2002) (no hearing required for several reasons, including that petitioner "has failed to show what more an evidentiary hearing might reveal of material import on his assertion of actual innocence").  Moreover, the state is not challenging the validity of the new DNA evidence so the Court does not need to conduct a hearing to resolve any credibility issues.  <u>Jaramillo</u>, 340 F.3d at 883-84 (evidentiary hearing required to permit parties to develop record and for court to "make the ultimate credibility determinations").

In sum, the Court finds that an evidentiary hearing is unnecessary and **DENIES** Petitioner's request for a hearing.

<u>**Conclusion**</u>

For the reasons stated above, the Court **ADOPTS** the Reports and Recommendations and **DENIES** Petitioner's petition for writ of habeas corpus.

04cv1533

1   Additionally, the Court **DENIES** Petitioner's request for an evidentiary hearing.  The

2   Clerk shall close the case.

3          IT IS SO ORDERED.

4   DATED:  July 25, 2007

5
                                    _____
6                                   MARILYN L. HUFF, District Judge
                                    UNITED STATES DISTRICT COURT
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   COPIES TO:
     Christopher Leon Baker, Pro Se
23   #H-11687
     Pleasant Valley State Prison
24   BFB5-234L
     P.O. Box 8502
25   Coalinga, CA 93210

26   Jeffrey J. Koch
     Deputy Senior Assistant Attorney General
27   State of California
     110 West A Street, Suite 1100
28   San Diego, CA 92101